Larosa v. Larosa, Mr. Padres, we'll hear from you first. Good morning, your honors, and may it please the court. My name is Paul Prados. I am counsel for Joseph and Dominic Larosa, the appellants in this matter, the plaintiffs in the case below. As your honors are aware, this is the second appeal in this matter. The benefit of the second appeal is that it is a much narrower issue that is before this court now, and it is simply a matter of statutory interpretation. The West Virginia Uniform Fraudulent Transfers Act mimics the language of the Uniform Fraudulent Transfers Act as it's enacted in nearly every jurisdiction in this country. The West Virginia Uniform Fraudulent Transfers Act, in this case, it matters most under 40-1A-1, the definition of asset, and later under subsection L, transfer, which is every mode, direct or indirect, absolute or conditional, voluntary or involuntary of disposing of or parting with an asset or an interest in an asset. The issue here is whether or not profits and business opportunities of a closely held corporation that was also controlled by Virgil B. Larosa can be considered to have been transferred if they were part of a common scheme to transfer those assets to insiders. As the district court found in its original opinion, and has still to this point not been overturned or questioned, the district court judge, Judge Stamp, had determined that the profits and business opportunities of Cheyenne Sales Company had been utilized in such a way in a common scheme with Regal and Virgil D. Larosa, the son of Virgil B. Larosa, and Virgil D.'s wife. Before you get to that, let me just see if we can't get to the fundamental structure on which we have to pose these questions. The statute basically says that a debtor who transfers property to avoid the creditor is transferring a fraud, defrauding the creditor. And the debtor here was Virgil B., right? Correct. So the question is, we have to first find out what property was Virgil B. transferring. And second, we have to ask whether it was property. And, of course, your business opportunity raises that question. But how do you – we need to first get to whether Virgil B. made any transfers as opposed to Cheyenne. Your argument is Cheyenne's making all these transfers and accommodating Regal and Virgil D., the son, accommodating them through all this business operations. But the corporations – no one has suggested the corporation – corporate veils should be pierced. And corporations are formed just for the purpose of isolating assets, limit liabilities and obligations. And so why don't you start with the first question, is what transfer did Virgil B. make of his own assets to defraud Joe and Dominic? And there are essentially two potential answers to that question. One that's addressed a little bit more in the briefs and one that's addressed a little bit less. The item that's addressed a little bit more is that Virgil B. was entitled to – was entitled as the sole shareholder and operator, was entitled to the profits. And essentially when he makes a decision not to distribute profits or to keep profits within the corporation or to not obtain profits in the first place – and there's some references in our brief to the profit margins really being the major issue here – that could be the asset, the property interest that belongs to Virgil B. I'm trying to find a transfer. First thing we have to have is a transfer out of Virgil B. to defraud his creditors. And what transfer did he make, Virgil B., of his own asset? He – if we're setting aside the issue of whether or not the profits are his asset, which I argue that they are, the second issue is under the definition of transfer. He didn't have any profits. I'm sorry? He didn't have any profits in his hand to transfer. There were no profits of the corporation because it was run in such a way that it was not profitable and done so on purpose. But he still had – and this gets to the second potential transfer, and that is of interest in an asset. And the asset that Virgil B. has here is his stock in the corporation. And his interest in it is the right to control, the right to receive profits and distributions from the company. And that interest in the asset was – But wasn't the stock not subject to transfer because it was the lien – the bank had the lien on the stock, right? You know, and I had to go back. Is that correct? Is that factually correct? Actually, I don't believe it is. Well, then, if it isn't, then you can get the stock if he transferred it out. But I'm not sure he transferred the stock. Going back and looking at the factual record, as best as I can tell, the stock wasn't actually transferred pursuant to the bank's lien. I thought the stock had a first lien – the bank had a first lien on the stock. But it doesn't make any difference because we're looking for a transfer. You've got to have a transfer, number one. That takes the asset away from Virgil B. out of his possession so that the creditors can't get it. Because the creditors only have a judgment against Virgil B. Correct. And his wife, I guess. Yes, Virgil B. and his wife. We use them collectively. Correct. But ultimately, what we're dealing with is that language within the West Virginia Uniform Fraudulent Transfers Act, that 40-1A-1. We don't have to look just at asset. We can look at interest in an asset. And the interest in the asset – Well, that's the property issue. You're still not getting to my transfer. Okay. The transfer in that instance – Well, that's a property, which is a pretty interesting argument. The transfer itself is – the definition of transfer under the West Virginia Uniform Fraudulent Transfers Act is very, very broad. And it's broad under the Uniform Fraudulent Transfers Act generally. But it's every mode, direct or indirect. So the transfer in this instance is the consistent decision to run the business in such a way that it wasn't accruing the profits that would benefit to the owner, director, and operator of the business itself. Because the definition of transfer is so broad, using words such as indirect, conditional transfers, voluntary or involuntary, disposing of or parting with an asset or an interest in an asset, it's that broad definition that essentially makes the decision to run your business as a common scheme for the benefit of another human being who is an insider and not for your own benefit an actual transfer. And that would be the most direct answer I can give to that particular line of questioning. Ultimately, the district court, after remand, changed its legal conclusion that business opportunities and lost profits of Cheyenne constituted transferred assets under the West Virginia Uniform Fraudulent Transfers Act. That was something that the court had posited as a possibility in its previous decision. The court had sent it back with essentially a set of directives, and those directives were in part to determine what assets were transferred and the value of those assets, but only if the district court, Judge Stamp in this instance, could identify assets that were transferred from Virgil B. to the insiders in this case. What ultimately happened with Judge Stamp's opinion, though, is he doesn't address head-on the fact that he is legally determining that business opportunities and lost profits of Cheyenne are not considered transferred assets under the West Virginia Uniform Fraudulent Transfers Act. He makes allusion to it and essentially decides that he's not going to award any damages for that. This court, when it ruled before, did not state definitively either at that time and sort of left it to Judge Stamp to decide in the court below. Unfortunately, here we are. We have this very, very broad definition of transfer under the West Virginia Uniform Fraudulent Transfers Act that references interest in assets, but also references any direct or indirect transfer, whether it's voluntary or involuntary. And this broad definition, unfortunately, throughout the United States as far as I and opposing counsel seem, at least in our briefs, appear not to have found any case directly on point, either in favor or against. It would actually militate. Here's where I'm confused. Joe and Dominic LaRosa loaned dollars to Virgil B. So as a result of that transaction, Virgil B. is a debtor to a debtor of Joseph and Dominic. It just so happens that Virgil is the sole shareholder in Cheyenne. There's nothing transferred that I can find out in from that transaction or any other transaction to Cheyenne by Virgil B. What did he transfer to them that Joe and Dominic should have been able to get their hands on? It seemed to me it was all in Cheyenne to begin with, and Cheyenne is the one who transferred it. Virgil B. was entitled to the benefits of Cheyenne, and those benefits of ownership of Cheyenne are what could have been attached had they – You answered just Niemeyer's question, or you agreed with him, that there's no piercing of the corporate bail opportunity here. Yes, the West Virginia Uniform Fraudulent Transfers Act is not part of the common law schemes of judgment collection, which might involve a piercing of the corporate bail issue. And none has been raised in the briefs, and none is before the court now, which is the reason why I answered that question that there is no piercing of the corporate bail at issue in this particular case. Instead, what we have is an interested and active shareholder of a closely held corporation for whom the trial court has specifically found was engaging in a common scheme to defraud the creditors in the way that he operated Cheyenne and Regal. It's that finding from the district court that has not been overturned, and that's a factual finding. That's not a legal finding, that there was a common scheme to run these in a particular way to defraud creditors. So it's based solely on that, that Virgil B. had a right, had an entitlement to all the benefits of Cheyenne and purposefully ran it away where he did not receive those entitlements. That's the transfer. Yes, it's an indirect transfer. Yes, it's a transfer likely in an interest of assets, but it is still a transfer under the West Virginia Uniform Fraudulent Transfers Act and under the Uniform Fraudulent Transfers Act generally, because the definition of transfer is intended to be so incredibly expansive. What property did Cheyenne transfer and who owned that property is the question. If Cheyenne owned it because it's a corporation, it doesn't matter what Virgil's status is as a stockholder. He's a stockholder, this is a corporation. Virgil B., the father and the debtor in this instance, was entitled to the benefits from that corporation. What he transferred through his actions as a director, as an agent and a stockholder of Cheyenne was what was due and coming to him had he run the business the way that he would have if it was a truly profit-making enterprise. What's kind of interesting about that is that Virgil B. did not have a duty to continue running Cheyenne, but if he did, he had a duty. How do you know it wasn't a profit-making enterprise? It's established extensively in the record that over the course of something like eight years, the total profits that it had made were about $20,000. Well, that's profit-making. The way I keep referring to it in the briefs is that it was run at or below cost at $20,000 over the course of eight years when it's processing millions of dollars in inventory. I'm not trying to exaggerate. I think about how we would assess how a corporation runs itself and spends its monies and if it's a bona fide corporation, and this is a bona fide corporation, for us to get involved in every internal transfer and say, this one was for value, this was a good deal, this one wasn't, this one favored a grandchild who happened to be an interior designer, so they paid the grandchild a pretty fat contract to redesign the offices, is that a transfer and defraud of creditors of the stockholder? I see my time is up. May I answer the question? Sure. This isn't getting at the business judgment rule. Obviously, the decisions made by a director in the performance of their duties is not going to be called into question. This is an instance in which we have a sole shareholder, a director, and the primary agent of a corporation who has been found factually to have engaged in an enterprise for purposes of committing fraud. And if he kept that money in the corporation and spent through the corporation only what you think should have been spent, so that instead of having $20,000 profit in the corporation or excess money, he had $100,000, you still don't get a transfer in fraud of creditors because Virtual B didn't transfer, he just held it in the corporation. He's allowed to do that. You could have attached the stock, but the stock, as I recall factually, and we'll get this clarified, but the stock was not transferred in this case into fraud of creditors. The stock was already held by the bank as security for the loan. Anyway, you can try it up. If you can shed light on that when you come back up, that would be fine. Yes, sir. All right. Mr. Heitzel. Good morning, Your Honors. May it please the Court, I am Matt Heitzel. I am counsel for the transferees Virgil and Sandy LaRosa. The relief that the creditors seek in this appeal ignores the facts that were established at trial. And contravenes the clear language of the West Virginia Uniform Fraudulent Transfer Act and goes against fundamental principles of corporate law as it relates to the distinction between what a shareholder and what a corporation owns. I certainly appreciate the Court's familiarity with this case. Rest assured, we are not attempting to hit all the different courtrooms in this facility. But we are here on the limited issue of whether the district court's decision in holding that there were no assets of the debtors transferred through the Cheyenne regal transactions. And the transferees submit that that was the correct decision, that was within the bounds of the and applied perfectly the West Virginia Uniform Fraudulent Transfer Act and is in accord with the fundamental corporate law regarding the differences between a shareholder and a corporation's property rights. This case is as much or even more about what is not out there than what is. The creditors keep referring to profits as something that were transferred. But there were no profits that were transferred. In fact, that is the primary complaint of the creditors. That's a hard statement to make. If you're going to get into the corporation to the extent that you overpay a supplier who's a family member, his argument is the overpayment is the transfer of profits. If it's an overpayment. That would be an overpayment. And separate in the court, I recognize that there's a couple issues involving who owns the property, number one. Number two, whether that is actually I'm talking about Cheyenne paying out cash to a supplier for a service or a product and paying too much because it happens to be a family member of a stockholder. Right. If Cheyenne were the debtor and I understand that. But I was just getting at the notion that theoretically, to the extent you overpay, you're transferring profits, aren't you? I would say to the extent that you transfer money to another entity, yes, you're transferring whether we turn it profits. It's not a profit because basically you're just increasing the expense. You're lessening the profit. I think profits can be problematic in that sense of what that actually means. But for purposes of this appeal, the profits or the opportunities that is being referred to by the corporation, those were the third category of, quote, unquote, fraudulent transfers that the creditors sought recovery. The related party transactions. And those transactions consisted of coal sales from Cheyenne to Regal. And coal was exchanged and dollars were exchanged. But the creditors have created sort of a fictitious business model to say that, oh, additional money should have been paid. They created this artifice surcharge of a wash fee that Cheyenne should have charged $3.50 per ton for every ton of coal that Cheyenne sold to Regal. Now, there's no contract for that. There's no contract with Cheyenne and Regal or with any other potential buyer out there. There's no evidence whatsoever that this coal could ever have been sold for an additional $3.50 per ton. But nonetheless, the creditors' theory of recovery is that, oh, that's a pool of money that the debtor did not direct Cheyenne to attempt to get. And so when the creditors talk about profits, it's actually the lack of profits. There's not a pool of money. There's not a bunch of money out there that was not transferred. It's the lack of profits. That's the complaint. And really, the related party transactions don't involve opportunities either. They were sales from Cheyenne to Regal. There is no evidence whatsoever that there were other potential buyers out there for this coal, that there were contracts that were transferred. And I'll get to this case in a second, the Bob Nichols Enterprises case. But that case, and I'll talk about that in a second, but we are so far afield of the transfer of anything at this point because what — I'm thinking about the transfer aspect of it, though. Are you saying then there's no evidence that the way Cheyenne operated with Regal, that they did so at the low market price? Things like, for example, there's no evidence that they could have received extra money from the coal washing process. That's correct. The theory of recovery that the creditors put forth is that Cheyenne should have charged a wash fee. And even the creditor, Dominic LaRosa, admitted that Cheyenne had never done that in its history before. Cheyenne wasn't in the business of charging a wash fee. It was in the business of buying coal and selling coal. And the creditors just didn't like the price that those coal sales transactions were occurring. So Cheyenne washing coal? Cheyenne was processing coal. Coal would be processed. And that process was washing a part of the process? Some parts of it were washed. That's correct. Some parts were just blended with other coals to make the ultimate order. So you're saying Cheyenne always did that gratis for everybody since they've been running? They never charged for washing coal in their process? I think the record will demonstrate that out of the 1.3 million tons of coal that Cheyenne sold to Regal over the time period, there was only 600 tons of coal that Cheyenne charged a separate wash fee. Otherwise, it sells the coal for the price of the coal. It's like washing your car or selling your car. You're going to sell a washed car, but you're not going to just – selling a car is different from washing a car. So that's sort of the difference. The idea that Cheyenne would charge a wash fee in the record has got no – So in the industry, that's not a surcharge or extra charge at all? That's correct. And even more importantly is the fact that Cheyenne never did that before in number two. There's no evidence that anybody out there would have said, all right, well, we'll buy this coal with that wash fee involved. We'll buy that coal with that additional charge. The creditor's claim is just that Cheyenne didn't charge enough. But the district court didn't decide on that factual basis. It decided that the whole idea of whatever Cheyenne did, whether it was something that was out of the norm or not or didn't charge for it, that didn't constitute a transfer, correct? Well, that's slightly correct, Your Honor. The district court said this related party transaction, this third category of fraudulently transferred assets, those involve coal of Cheyenne. That's not a debtor's asset. That's what I'm saying. So it said even if they were right that this was something that they otherwise normally did, it didn't matter. That's my point. That's exactly right, Your Honor. So my question is this. So you're saying that a corporation could, for example, operate and have retained capital and then decide. You've got a debtor, like Virgil B., who owns 100% of the corporation. They have retained capital, belongs to the corporation. And then they could say, well, you know what? Let's loan our retained capital to another corporation, and we'll be lax about requiring them to pay it back. So the question is, so is depleting the asset, which is the stock you own in the corporation, is that tantamount to a transfer and defrauding your credit? Well. That's just what you're doing. It's a transfer or depletion of wealth of an asset. That's what you're doing because it's got retained capital of $100,000, and you just allow another corporation to get that for wink, nod. This is hypothetical. A wink, nod loan. And then, therefore, you have now gutted that retained capital. And you say, your creditor says, oh, I'm sorry. Our corporation is not worth much because, you know, retained capital. We decide as a corporation, or it decided, that it's going to do that. So you can do that to undermine a creditor and never be a transfer under West Virginia law? That scenario that you just described, Judge Gregory, presumes that the corporation, in the first instance, actually had the retained capital. So, and I understand, under those circumstances, it's possible that that may be considered if the corporation itself. Well, let's make it a debt receivable, then, so we can bring it into the hypothetical. $100,000 debt receivable that it just forgave. That's it, but they don't have the money now in hand. So let's get more closer to this hypothetical, to the fact. Can you do that, then? Well, I think under the way that the statute applies, if Cheyenne were the creditor, I think that would be. . . No, no, no. I'm sorry, if Cheyenne were the debtor. No, no, Cheyenne is not the debtor. Virgil B. is the debtor, but he's the 100% shareholder of the corporation. Corporation has a $100,000 debt receivable, and rather than receiving that, said, no, no, no, don't worry about that. You know, pay us if and when you want to. That would never, under West Virginia law, constitute a fraudulent transfer, is what your position is. That's correct, Your Honor. And that is because there is a fundamental difference between what a shareholder owns and what a corporation owns. And that is a principle of corporate law that has been in place since the 1920s. And I would certainly posit to you if that position. . . Well, let me address a case that I mentioned earlier, the Bob Nichols. And I apologize, Your Honors, let me just mention two more things. Justice Niemeyer, you asked if the stock was pledged, and it was pledged. The stock itself was pledged to the bank for the line of credit. In addition, the accounts receivable of Cheyenne were pledged as collateral for this line of credit. So separate and distinct, just following these hypotheticals, those are, if Cheyenne were the debtor, those would be assets to the debtor, but they would not fall under the definition of assets that could be transferred under the Uniform Fraudulent Transfer Act because they would be subject to a lien. And this Court addressed that very issue when we were here before. So if you followed through on Judge Gregory's hypothetical and assumed that he forgave a $100,000 debt, then if the corporation did not forgive it and got the $100,000 within it and chose to make dividend distributions, they would still go to the bank, or not? It would depend upon the relationship between the corporation and the bank and what was outstanding on the loan. But the statute, and this goes back to something that the Court, I think, addressed earlier regarding the fact that if an asset is pledged, if there is a lien on an asset, then that asset can't be subsequently transferred to make a Uniform Fraudulent Transfer Act transfer. But you could earn dividends on it. You just can't sell it. You can't transfer it, but you get the dividends on a pledge. It's just the stock is a lien on the stock. It depends whether the pledge includes the proceeds. Most pledges always are not of this type, but a pledge would always include proceeds of inventory, for instance. You get the inventory or the proceeds of the inventory. The question is if you pledge stock and the proceeds of it. I don't know. But you're still going through the corporate structure. Right. That's correct. And two points. Number one, the Bob Nichols Enterprises case, that was decided in the United States Bankruptcy Court for the Southern District of Texas. It's in the transferee's brief on page 20. It was decided in 2007, and it is very substantially similar facts and law. In that case, the debtor was a corporation. It was a printing company. And the shareholder of the debtor had received, had obtained purchase orders from customers for print jobs. And the shareholder had actual purchase orders. The shareholder realized that the corporation was going to go bankrupt, so the shareholder started another corporation and took those purchase orders and did business with those purchase orders, completed the job. And the corporation that filed for bankruptcy, the trustee said, oh, wait a minute, those are corporate opportunities. Those are assets. And the trustee brought a Uniform Fraudulent Transfer Act claim against the shareholder, and its subsidiary company that actually did the job and made the money, and said that's a fraudulent transfer. And the bankruptcy court said the mere expectation of profit is not an asset. And this is important because the Texas Uniform Fraudulent Transfer Act has the exact same provisions as the West Virginia Uniform Fraudulent Transfer Act. Asset is defined as property of a debtor. Property is anything subject to ownership. But most importantly, there's that similar provision in the Texas Uniform Fraudulent Transfer Act as in the West Virginia Uniform Fraudulent Transfer Act. And that is a debtor cannot transfer an asset until it has rights in that asset. You can't transfer profits that you don't get because you don't have rights in those profits. Now, you could transfer a contract that says you have a right to business and you transfer that. You could transfer that. That's not what happened in this case. Well, actually, in this case, there was a purchase order. And the bankruptcy court even went so far to say, well, even a purchase order, that's an expectation, but it's not actual cold, hard cash. You don't have that. So the expectation of profit is not enough. You have to have an actual asset, something tangible that can be subject to ownership. You need a claim of entitlement. And the court went into the analysis of if the debtor corporation sued the shareholder for torturous interference with business expectancy, would they win? And the answer was no, they wouldn't win because there's no asset that's subject to ownership. And that is exactly what the creditor's claim is here. Their profits or opportunity is a mere expectation of profit. That is not anything that they could have any entitlement to or ownership. Facts are different. Now, this case even had a purchase order. We didn't even have a purchase order in this case. It was just simply dissatisfaction with the prices that Cheyenne was charging to Regal. That was it. So I think that this case, the N. Ray Bob Nichols Enterprises case, is precisely on point to the issue in front of the court. The other point that I want to get to real quick, and, Your Honor, you had mentioned that there is no transfer, and I agree with you. There is no transfer. But moving on to the property issue, as a basic fundamental corporate law premise, a shareholder and a corporation are different, distinct legal entities. They have a different legal existence. A shareholder can own property, and the corporation doesn't own that. A corporation owns property. The shareholder doesn't own that. And this is important because the district court was spot on when it said that the related party transactions involved the sale of coal, Cheyenne's coal. It didn't involve any of the debtor's assets. And as I just mentioned, the mere expectation of profit is not a property right of a shareholder. Only until a corporation realizes profits and brings them in and then decides to distribute them to a shareholder is that shareholder's property. And not only did that not happen, there wasn't even any profits that were brought in in this matter. And that's the crux of the related party transaction. You didn't charge enough. No money was created. And that is precisely one of the reasons why the district court said this is not an actionable claim under the Uniform Fraudulent Transfer Act because there is no property of the debtor. And the Fourth Circuit, I think, sort of addressed this almost sort of spot on back in the 1920s in the case Wilson v. Williams Hardware. In that case, a parent corporation filed for bankruptcy. The trustee in the bankruptcy sought to get the merchandise that the subsidiary company in West Virginia had in its company store. And there was the question of, okay, is the shareholder's property and the corporation's property, are they one and the same? And the Fourth Circuit said, and it's the Wilson v. Williams Hardware case, 32, Fed Second 103, said there is a difference between owning stock in a corporation and its assets. Assets do not pass to the trustee in a stockholder's bankruptcy, even if it's the sole shareholder. The shareholder and the corporation are distinct. And here, that's the same. They just can't make that leap. The creditors can't make that leap from Cheyenne's assets to debtor's assets. And the one case that the creditors mentioned in their brief, the Arizona v. Wright matter, that case involved Arizona community property laws. And in that case, the husband and wife entered into a premarital agreement, and they had a written agreement that said, we're going to agree amongst ourselves that notwithstanding the Arizona community property laws, we are going to say that whatever we earn is going to be our own. It will be our own. So there was a distinct right that was created. Well, the husband went into bankruptcy, and after he went into bankruptcy, said to his wife, let's modify that agreement. Let's go back and say, no, no, everything that we earn is now going to be community property. So he had a right, and he gave it up. And that is the essence of the transfer and the Arizona v. Wright matter. None of that applies to this case. The idea that there's an expectation of profit doesn't apply. That's what the Arizona v. Wright case is about. In conclusion, Your Honors, the creditors are seeking to recover something that the debtors never had from the transferees who never received it. That's why the district court was correct in its decision in denying relief based upon those transfers. Thank you, Your Honors. Mr. Prados? I just have a few clarifying issues to address. First off, a factual issue, as stated by opposing counsel, said a number of times there's no evidence whatsoever that the coal could have been sold for more. The district court, in its original decision in this determination, has not been overturned. The district court acknowledged the existence of expert testimony on that exact issue, and that's in the joint appendix at page 2383 in paragraph 29 of the district court's first opinion. Judge Niemeyer had raised the issue of whether or not the stock held by Virgil B. was subject to a lien. And this is something in preparing for this oral argument. I found that none of the opinions had specifically said one way or another whether that was the case, which unfortunately means that the – I thought pretty clearly, actually. I thought that there was a line of credit extended by the bank to Cheyenne, and in order to induce the bank to extend that line of credit, Virgil B. put up the stock. And most of what you're describing is 100 percent accurate, but in each of the opinions it refers to pledges of stock. It doesn't actually specify what stock was actually pledged. And – What other stock was there? Virgil B. only held the stock of Cheyenne in terms of this case. I'd have to go back to the factual record to determine whether or not there was some other stock that might have been referenced, but in the joint appendix that's before the court here now, we have the credit agreements, and those credit agreements – between the bank and Cheyenne and Virgil B. La Rosa and his wife, and those credit agreements are located – joint appendix pages 1255 to 1284. The closest thing that I was able to find regarding stock is on page 1255, where collateral is identified as such stock that would be in the possession of the bank at that point in time or under the bank's control. And there's no indication anywhere in the record from the court below that the stock for Cheyenne was being held by the bank, either as an agent or proxy for Virgil B. La Rosa. In other words, the facts in the court below, as best as I'm able to piece together from the record, here in 2014 for a trial that happened four or five years ago, is that the stock itself was never in the possession or under the control of the bank, and so the bank did not actually have a lien on the stock of Cheyenne. Opposing counsel makes reference to the Bob Nicholas case regarding expectations of profits. There's a very clear distinction between this particular case and the expectation of profits in the Bob Nicholas case. The expectation of profits was a reference to potential future earnings, whereas in this particular matter we're talking about transactions that have long since transpired and should have been yielded to the benefit of the primary shareholder. And since they did not, they diminished the asset, which is the stock of Virgil B. La Rosa. It's this difference between potential future earnings and earnings that have already been foregone that distinguishes this case from a number of the matters that are referenced in opposing counsel's brief. In Arizona v. Wright, it's interesting. Arizona v. Wright does involve a pledge of future earnings, which somewhat contradicts what I was just saying, except for the fact that in Arizona v. Wright, it was found that that pledge of future earnings was a transfer at that time. It's the closest case I've been able to find to the one before the court now, and it's an even more tenuous situation to determine that that was a transfer under the Uniform Fraudulent Transfers Act than the matter that is before the court here. Unfortunately, that case is from across the country and definitely not a circuit court case. But to the extent that we're looking for something to hang our hat on and identify with this particular matter, the Arizona v. Wright is the best that we can find. We ask that the matter be remanded back to Judge Stamp and damages be determined by Judge Stamp. Thank you, Mr. Prado. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Roger L. Gregory, Henry F. Floyd